**LEGAL AID SOCIETY OF HAWAII, et al., Plaintiffs,**

v.

**LEGAL SERVICES CORPORATION, Defendant.**

**Civil No. 97–00032 ACK.**

United States District Court, D. Hawai'i.

Feb. 14, 1997.

Paul Alston, Bradford L. Tannen, Alston Hunt Floyd & Ing, Honolulu, HI, Stephen V. Bomse, Charles N. Freiberg, Adam M. Cole, Rakesh K. Anand, Robert A. Rosenfeld, Heller Ehrman White & McAuliffe, San Francisco, CA, Stanley E. Levin, Davis Levin Livingston Grande, Honolulu, HI, Hope L. Hudson, Heller Ehrman White & McAuliffe, Palo Alto, CA, Steven R. Shapiro, Robin L. Dahlberg, American Civ. Liberties Union, New York City, Margaret C. Crosby, American Civ. Liberties Union, San Francisco, CA, for Legal Aid Soc. of Hawaii, Legal Services of Northern California, Inc., San Fernando Valley Neighborhood Legal Services, Legal Aid Soc. of Orange County, Alaska Legal Services Corp., California State Client Council, The Hawaii Justice Foundation, The Impact Fund, Lloyd Van De Car, Gary F. Smith.

Daniel A. Bent, Carlsmith Ball Wichman Murray Case Mukai & Ichiki, Honolulu, HI, Thomas S. Williamson, Jr., Georgia Kazakis, Ernest A. Young, Erika F. King, Covington & Burling, Washington, DC, for Legal Services Corp.

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

KAY, Chief Judge.

This case concerns Congress' ability to place restrictions on non-federal public funds and those private funds not previously restricted (hereinafter "Non–LSC funds")

where such restrictions completely foreclose the exercise of certain constitutional rights.

### FACTUAL BACKGROUND

In 1974, Congress created the Legal Services Corporation, ("LSC") a private, non-profit corporation, to distribute funds from Congress to various independent legal programs. 42 U.S.C. § 2996 *et seq.* The LSC is governed by an 11 member board appointed by the president and confirmed by the Senate. 42 U.S.C. § 2996a The congressionally established aims of the LSC include the "need to provide equal access to the system of justice in our Nation for individuals who seek redress of grievances." *See* 42 U.S.C. § 2996(1).

Since its zenith in the late 1970s, the LSC has increasingly come under attack. In fact, the LSC has operated without authorization since 1980 surviving only through annual appropriation bills. *See e.g.* Congressional Quarterly Weekly Report, 1/22/94.

More recently, many lawmakers sought to abolish the LSC. The elimination of the LSC was averted, however, when in exchange for numerous conditions placed on the funds, Congress continued funding the LSC. This suit arises out of the conditions imposed by Congress in 1996 and 1997 by the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321, § 504(d)(1) ("1996 Budget") and the Omnibus Consolidated Appropriations Act of Fiscal Year 1997, Pub.L. No. 104–208, 110 Stat. 3009, § 502(a) ("1997 Budget").

In the 1996 and 1997 Budgets, Congress placed the following prohibitions on agencies that accepted LSC funds: (1) advocating or opposing any reapportionment of a legislative, judicial or elective district on any level, 1996 Budget § 504(a)(1); (2) influencing the "issuance, amendment, or revocation of any executive order", 1996 Budget § 504(a)(2); (3) "attempt[ing] to influence any part of any adjudicatory proceeding of any Federal, State, or local agency," 1996 Budget § 504(a)(3); (4) attempting "to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative … of the Congress or a State or a local legislative body" 1996 Budget Act (a)(4); (5) initiating or participating in a class action lawsuit, 1996 Budget § 504(a)(7); (6) litigating or lobbying in an effort to reform the federal or state welfare laws or systems, 1996 Budget § 504(a)(16); (7) representing certain aliens except in cases of domestic violence, 1996 Budget § 504(a)(11); (8) "conduct[ing] a training program for the purpose of advocating a particular public policy or encouraging a political activity", 1996 Budget § 504(a)(12); (9) claiming or collecting attorney's fees; 1996 Budget Act § 504(a)(13); (10) "participating in any litigation on behalf of a person incarcerated in a Federal, State, or local prison", 1996 Budget Act § 504(a)(15); (11) representing people allegedly engaged in certain illegal drug activity in public housing eviction proceedings, 1996 Budget Act § 504(a)(16); and (12) "participat[ing] in any litigation with respect to abortion", 1996 Budget Act § 504(a)(14). These prohibitions applied to LSC as well as to non-LSC private funds.[1] The Act also required a written statement of facts be prepared by the legal aid organizations prior to initiating litigation or pre-litigation negotiations. 1996 Budget Act § 504(a)(8).

On January 9, 1997, five legal service programs (the Legal Aid Society of Hawaii ("LASH"), Legal Services of Northern California, Inc. ("LSNC"), San Fernando Valley Neighborhood Legal Services ("SFNLVS"), Legal Aid Society of Orange County, and the

---

1. Many of these restrictions were in effect prior to the 1996 and 1997 Budgets. For instance, the 1974 Act creating the LSC prohibited recipients from using LSC funds: (1) to campaign for any candidate, 42 U.S.C. § 2996e(d)(3); (2) to advocate or oppose any "ballot measures or initiatives", *id.* at (d)(4); (3) to "support or conduct training programs for the purpose of advocating public policies or encouraging political activities", 42 U.S.C. § 2996f(b)(6); (4) "to provide legal assistance with respect to any proceeding or litigation which seeks to procure a nontherapeutic abortion", *id.* at (b)(8); (5) "to provide legal assistance with respect to any proceeding or litigation relating to the desegregation" of schools, *id.* at (b)(9); and (6) to provide legal assistance with respect to military desertion cases. In 1976, these restrictions were applied to non-LSC funds except for tribal and "interest on lawyers trust account" ("IOLTA") funds. 41 Fed.Reg. 25901; 45 C.F.R. § 1610 (1976).

Alaska Legal Services Corporation), a group representing legal services clients (California State Client Council), two organizations that have funded work by legal service programs (the Hawaii Justice Foundation and The Impact Fund), and two legal service program lawyers (Lloyd Van De Car and Gary F. Smith) (hereinafter collectively referred to as "Plaintiffs") brought suit challenging these restrictions. The Plaintiffs ask this Court to enjoin the LSC from enforcing the restrictions.

On January 14, 1997, the Court held a status conference wherein the motion for the preliminary injunction was set for February 14, 1997.[2] On January 24, 1997, the Court memorialized the briefing schedule for the hearing in an order. Pursuant to the order, the LSC filed its opposition to the preliminary injunction on January 30, 1997. The Plaintiffs filed their response on February 4, 1997. The Court held a hearing on February 14, 1997.

### STANDARD OF REVIEW

1. *Preliminary Injunction*

The standards for granting a TRO and a preliminary injunction are similar. *Cf. Los Angeles Unified School Dist. v. United States Dist. Court For Central Dist. of California*, 650 F.2d 1004, 1008 (9th Cir.1981) (standard for preliminary injunction is at least as strict as that for TRO) (Ferguson, J., dissenting); *Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci*, 857 F.2d 505, 507 (9th Cir.1988) (district court denied motion for TRO which was treated by stipulation as also a motion for preliminary injunction).

In *Miller v. California Pacific Medical Ctr.*, 19 F.3d 449 (9th Cir.1994), the Ninth Circuit set forth the standard for granting a preliminary injunction as follows:

Traditionally we consider (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to the moving party if relief is not granted;

(3) the extent to which the balance of hardships favors the respective parties; and (4) in certain cases, whether the public interest will be advanced by granting the preliminary relief.

*Id.* at 456 (citing *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987)).

The moving party must show 'either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) the existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits.'

*Miller*, 19 F.3d at 456 (quoting *Senate of California v. Mosbacher*, 968 F.2d 974, 977 (9th Cir.1992)).

'These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.'

*Miller*, 19 F.3d at 456 (quoting *Odessa Union*, 833 F.2d at 174).

The grant or denial of a TRO or preliminary injunction is reviewed for abuse of discretion. *See Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1132–33 (9th Cir. 1979).

### DISCUSSION

I. *Likelihood of Success*

In obtaining a preliminary injunction, the Plaintiffs' likelihood of success determines what other elements the Plaintiffs need to prove. If the Plaintiffs can show **"probable** success on the merits" then Plaintiffs need only "show ... the possibility of irreparable harm." *Miller v. California Pacific Medical Center*, 19 F.3d 449, 456 (9th Cir.1994). If the Plaintiffs, however, can only show a "a **'fair'** chance of success," then they must also "show that there are serious questions going to the merits of the case and that the balance of the hardships tips decid-

---

2. On January 26, 1997, the Department of Justice ("DOJ") filed a request for 30 days within which to decide whether to intervene and to file a response to the Plaintiff's motion. On January 28, 1997, the Plaintiffs and the LSC filed their respective responses to the DOJ's request. On January 29, 1997, the Court denied the DOJ's request in a written order.

edly in its favor." *Id.* at 460 n. 5. If Plaintiffs cannot establish at least a "fair chance" of success, no preliminary injunction should be granted.[3]

### A. Constitutional rights are at stake

To prevail, Plaintiffs must prove that the restrictions infringe their constitutional rights.[4] A *sine qua non* of this burden is proving that the restrictions at least implicate Plaintiffs' constitutional rights. In their effort to meet this burden, Plaintiffs recite a laundry list of constitutional rights which supposedly apply. In this case, the most compelling, and applicable, of these rights are the right to lobby and the right to associate.

 The First Amendment clearly protects the right to lobby legislators and administrators. *See e.g. California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). The right to lobby or petition, moreover, "extends to all departments of the Government." *Id.* at 510, 92 S.Ct. at 612. Yet, Plaintiffs' right to lobby various agencies and in support of certain causes is prohibited by the LSC. For example, Plaintiffs are prohibited from: (1) advocating or opposing any reapportionment of a legislative, judicial or elective district on any level, 1996 Budget § 504(a)(1); (2) influencing the "issuance, amendment, or revocation of any executive order", 1996 Budget § 504(a)(2); (3) "attempt[ing] to influence any part of any adjudicatory proceeding of any Federal, State, or local agency," 1996 Budget § 504(a)(3); (4) "attempt[ing] to influence the passage or defeat of any legislation, constitutional amendment, referendum,

initiative, or any similar procedure of the Congress or a State or a local legislative body" and (5) litigating or lobbying in an effort to reform the federal or state welfare laws or systems, 1996 Budget § 504(a)(16). Because these restrictions implicate the right to lobby, the Court finds these restrictions subject to constitutional scrutiny.

The right to petition the government has also been extended to a "right of access to the courts." *Id.*; see also *N.A.A.C.P. v. Button*, 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 ("[U]nder the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances.") The Court in *Button* also recognized that the right to association may be implicated when the state attempts to regulate the interaction between a legal foundation and its clients. *Id.* at 431, 83 S.Ct. at 337 ("For such a group [a public interest legal foundation], association for litigation may be the most effective form of political association."). Moreover, "[s]ubsequent Supreme Court decisions have interpreted *Button* as establishing the principle that 'collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment.'" *Charles v. Daley*, 846 F.2d 1057, 1074 (7th Cir.1988) *quoting In re Primus*, 436 U.S. 412, 426, 98 S.Ct. 1893, 1901, 56 L.Ed.2d 417 (1978); see also *Martin v. Lauer*, 686 F.2d 24, 32 (D.C.Cir.1982) ("Meaningful access to the courts is a fundamental right of citizenship in this country. Indeed all other legal rights would be illusory without it.") (citations omitted).

 The right of meaningful access to the courts, however, has only been vaguely

---

**3.** In its opposition, the LSC attempts to characterize the Plaintiffs' case as one involving a mandatory injunction as opposed to a prohibitory injunction. *See* Opposition at pg. 48. A mandatory injunction commands performance of certain acts whereas a prohibitory injunction prohibits the performance of certain acts. *See e.g. Anderson v. United States*, 612 F.2d 1112, 1114–5 (9th Cir.1979). The severity of a mandatory injunction makes it a disfavored option which courts should deny "unless the facts and law clearly favor the moving party." *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir.1994).

Through this motion, the Plaintiffs seek to prohibit the LSC from enforcing the restrictions embodied in the 1996 and 1997 Budgets thereby making it a prohibitory injunction. Accordingly, the Court will apply the *Miller* continuum rather than the heightened standard of a mandatory injunction.

**4.** It is uncontested that the LSC qualifies as a state actor for purposes of the constitutional analysis. *See also Texas Rural Legal Aid v. Legal Services Corp.*, 940 F.2d 685, 699 (D.C.Cir.1991) (holding that the LSC is a state actor).

applied and defined since its recognition in *Button* and *California Motor.* At a minimal, though, the right of meaningful access must encompass the right to vindicate constitutional rights. How meaningful would a litigants' access to the courts be if the most sacred of all rights, constitutional ones, could not be vindicated. The Court, therefore, finds that the First Amendment right of meaningful access to the courts protects a litigant's right to vindicate constitutional rights. Accordingly, the Court holds that 1996 Budget Act Section 504(a)(14) limiting participation "in any litigation with respect to abortion" implicates that right and is subject to constitutional scrutiny in view of the Supreme Court's ruling in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), which held that the right to an abortion is protected by the Constitution.

■ Aside from the underlying right of meaningful access to the courts, the Supreme Court's recognition of such a right entitles it to further protection under the corresponding right of association. As the Supreme Court explained in *Board of Dirs. of Rotary Intern. v. Rotary Club:*

> [T]he right to engage in activities protected by the First Amendment implies a 'corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.' For this reason, 'impediment to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment.'

481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987) (citations omitted); *see also Shahar v. Bowers,* 70 F.3d 1218, 1225 (11th Cir.1995) ("Expressive association is the 'right to associate for the purpose of engaging in those activities protected by the First Amendment' "). Like all First Amendment rights, infringement of the right to association may be justified by a compelling governmental interest. *Id.* at 549, 107 S.Ct. at 1948.

■ Read together, the freedom of association defined above coupled with the right of meaningful access to the courts provides First Amendment protection from government's intentional interference with the confidential relationship between lawyers (or legal aid associations) and prospective clients. *See e.g. Haitian Refugee Center, Inc. v. Baker,* 953 F.2d 1498, 1513 (11th Cir.1992) ("*Button* and *In re Primus* recognize a narrow First Amendment right to associate for the purpose of engaging in litigation as a form of political expression"). This right can be regulated (especially in cases involving pecuniary gain) but cannot be completely foreclosed absent a compelling interest. *See e.g. In re Primus,* 436 U.S. 412, 426, 98 S.Ct. 1893, 1901–02, 56 L.Ed.2d 417 (1978) (holding that broad rules regulating attorneys cannot be enacted if they impair the First Amendment fundamental right of collective activity undertaken to obtain meaningful access to the courts) The Court, therefore, finds that the following LSC regulations implicate the foregoing First Amendment right: (1) 1996 Budget Act Section 504(a)(16) limiting Plaintiffs from representing people allegedly engaged in certain illegal drug activity in public housing eviction proceedings; and (2) 1996 Budget § 504(a)(12) preventing Plaintiffs from "conduct[ing] a training program for the purpose of advocating a particular public policy or encouraging a political activity."

■ Not all the restrictions, however, fit neatly within the right to associate. For instance, the 1996 Budget Act Section 504(a)(15) limiting Plaintiffs from "participating in any litigation on behalf of a person incarcerated in a Federal, State, or local prison" involves issues concerning a prisoner's right of association.[5] Unlike an ordinary citizen, the associational rights of prisoners "may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations ... possess the likelihood of disruption of prison order or stability...." *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977); *see also Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir.1985).

---

5. Although the Court is looking at the Plaintiffs' association rights, the Plaintiffs' rights cannot be separated from the parties with whom they wish to associate with.

Here, however, there is no reason why the Plaintiffs' legal assistance "possess[es] the likelihood of disruption of prison order or stability." Accordingly, the Court finds that 1996 Budget Act Section 504(a)(15) implicates Plaintiffs' First Amendment rights.

■ The regulations concerning aliens must also be analyzed differently. *See* 1996 Budget Section 504(a)(11) limiting Plaintiffs from representing illegal aliens except in cases of domestic violence. As the Supreme Court has stated:

> "Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded as any aspect of our government.

*Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954). In accordance with this policy, courts have not protected an aliens' rights of association.[6] *See e.g. Galvan v. Press,* 347 U.S. 522, 530–32, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954) (upholding deportation of alien who joined the communist party); *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (holding that nonresident alien could not assert First Amendment right). In fact, the Supreme Court has even found that citizens' First Amendment rights of association insufficient to warrant interference with Congress' power concerning aliens. *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (rejecting citizens' First Amendment arguments in light of Congress' power concerning aliens.) Those same considerations

apply here. If Congress in its near plenary power over aliens decides that legal aid associations and their lawyers should not represent them, that decision should not be disturbed. Consequently, the Court finds that 1996 Budget Section 504(a)(11) limiting Plaintiffs from representing illegal aliens except in cases of domestic violence does not implicate Plaintiffs' constitutional rights.

■ The Court also questions whether the First Amendment right to associate for the purpose of engaging in litigation as a form of political expression extends to class actions.[7] *See* 1996 Budget Section 504(a)(7) limiting the initiation or participation in a class action lawsuit. No appellate court has previously extended First Amendment protections to class actions despite encouragement from scholars. *See e.g.* John Leubsdorf, *Constitutional Civil Procedure,* 63 Tex. L.Rev. 579, 617. Not that such an extension would be completely unwarranted. In *California Motor Transport,* an antitrust case, the Supreme Court concluded "that it would be destructive of rights of association and petition to hold that groups with common interests may not ... use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view." 404 U.S. 508, 510–11, 92 S.Ct. 609, 612, 30 L.Ed.2d 642 (1972). This reasoning could very well apply to class actions.

■ If the Court accepted this reasoning, however, Rule 23 would be transformed into a constitutional entitlement. Given the recent resurgence of class actions,[8] the Court questions whether they rise to a constitutional entitlement.[9] The Court, moreover, finds it imprudent to constitutionalize the rules of civil procedure absent any appellate precedent. Thus, at this point, the Court finds

---

6. Recently, four Justices voted that the First Amendment does not even apply to aliens. *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265, 110 S.Ct. 1056, 1061, 108 L.Ed.2d 222 (1990); *accord United States ex rel. Turner v. Williams,* 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904) (holding that excludable aliens are not entitled to First Amendment rights).

7. A Supreme Court in New York has found that the LSC restrictions concerning class actions not only implicate First Amendment rights but in-

fringe them as well. *Varxhavsky v. Geller,* Index No. 40767/91 (N.Y.Sup.Ct.12/24/96).

8. The Court notes that although the prominent use of class actions is a recent phenomena, some scholars assert that class actions have been around for over 800 years. *See* Stephen C. Yeazell, From Medieval Group Litigation to the Modern Class Action (Yale University Press, 1987).

9. For instance, the *Button* case decided in 1963 predates Rule 23 as we know it, enacted in 1966.

that 1996 Budget Section 504(a)(7) limiting the initiation or participation in a class action lawsuit does not implicate any constitutional rights.[10]

Finally, the Court is unpersuaded by Plaintiffs' arguments asserting a constitutional right from: (1) 1996 Budget Act Section 504(a)(13) preventing Plaintiffs from claiming or collecting attorney's fees under federal or state law; or (2) 1996 Budget Act Section 504(a)(8) requiring that a written statement of facts be prepared by the legal aid organizations prior to initiating litigation or pre-litigation negotiations. With regard to attorney's fees, Plaintiffs do not cite any authority that fee-shifting provisions violate Due Process or implicate the First Amendment. Moreover, because the provision does not implicate a suspect class, under Equal Protection the restriction need only pass rational basis which it clearly does; e.g. interest in ensuring that cases are not brought by legal aid foundations solely to collect fees. Section 504(a)(8) also appears to implicate no constitutional rights. Plaintiffs argue that the regulation tilts the playing field in that other parties need not prepare a statement of facts. The implementing regulation (45 C.F.R. 1636), however, limits the statement's access to the LSC and Federal agencies auditing the LSC.[11] Thus, any inequality present certainly does not rise to a Due Process issue. In addition, the fact that the Due Process Clause recognizes a right of meaningful access to the courts does not transform every disparity among parties into a constitutional issue. The Court, therefore, finds that 1996 Budget Act Section 504(a)(13) preventing Plaintiffs from claiming or collecting attorney's fees under federal or state law and the 1996 Budget Act Section 504(a)(8) requiring that a written statement of facts be

prepared by the legal aid organizations prior to initiating litigation or pre-litigation negotiations do not implicate Plaintiffs' constitutional rights.

In short, certain LSC restrictions do not implicate constitutional rights and should not be enjoined. Other restrictions, however, are implicated by Plaintiffs' First Amendment right to petition and association. The question, therefore, becomes whether those latter restrictions not only implicate the First Amendment but whether they also impinge the First Amendment.

B. *An overview of Unconstitutional conditions*

The issue of subsidies/penalties and the First Amendment has bedeviled courts for years. A primary reason for the confusion has been the doctrine of "unconstitutional conditions." The Court best defined the doctrine in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972):

> [E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command direct-

---

**10.** The Court finds that Plaintiffs' Due Process argument concerning the right to bring class actions similarly unavailing. Like the First Amendment right, the Due Process Clause merely "encompasses a right of access to the courts" that has never been applied to class actions. *See Los Angeles County Bar Association v. Eu,* 979 F.2d 697, 705 (9th Cir.1992). Thus, the same concerns discussed earlier—constitutionalizing civil procedure; no appellate guidance—apply.

Finally, Plaintiffs' efforts in establishing an Equal Protection violation also fail. No suspect classification is involved in Congress' decision to

prohibit legal aid organizations from bringing class actions. *See Maher v. Roe,* 432 U.S. 464, 470–71, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977) (The "Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis). Thus, Congress' decision need only have a rational basis to pass constitutional muster.

**11.** The regulations do leave open the possibility that the statements may be discoverable but this Court finds such a possibility unlikely.

ly.' Such interference with constitutional rights is impermissible.

*Id.* at 597, 92 S.Ct. at 2697.[12] On the surface, this doctrine appears straightforward. In its application, however, "determining the constitutionality of government subsidization of expression is one of the most frustrating tasks ... of the First Amendment." Martin H. Redish & Daryl Kessler, *Government Subsidies and Free Expression*, 80 Minn. L.Rev. 543, 544 (1996).

Despite its pitfalls, three Supreme Court cases have shed more light on this tortured doctrine. *See Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (*"TWR "*); *Federal Communications Commission v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (*"League "*); *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (*"Rust "*).

### 1. *Regan v. Taxation with Representation*

The Court in *TWR* confronted the issue whether an Internal Revenue Service ("IRS") provision that only granted tax exemptions to non-profit corporations which did not lobby violated TWR's constitutional right to lobby. 461 U.S. at 542, 103 S.Ct. at 1999. In short, TWR argued that in exchange for receiving deductions, it forfeited its right to lobby in violation of the unconstitutional conditions doctrine. *Id.* at 545, 103 S.Ct. at 2000–01.

The Supreme Court disagreed. First, the Court found that Congress has "especially broad discretion in creating classifications and distinctions in tax statutes" which entitles tax laws to a "presumption of constitutionality." *Id.* at 547, 103 S.Ct. at 2002. Second, the Court rejected TWR's argument "that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Id.* at 546, 103 S.Ct. at 2001. Third, the Court found the provision to be content-neutral. *Id.* at 548, 103 S.Ct. at 2002 ("We find no indication that the statute was

intended to suppress any ideas or any demonstration that it has had that effect.")

Finally, the Court found that the IRS did "not deny TWR the right to receive deductible contributions to support its non-lobbying activity." *Id.* The Court relied on the fact that TWR could:

obtain tax deductible contributions for its non-lobbying activity by returning to the dual structure it used in the past, with a § 501(c)(3) organization for non-lobbying activities and a § 501(c)(4) organization for lobbying

*Id.* at 544, 103 S.Ct. at 2000. The relative import of these various holdings became clearer in *Rust* and *League*.

### 2. *FCC v. League of Women Voters*

The Court in *League* confronted the issue whether the Corporation of Public Broadcasting's ("CPB") condition forbidding "any noncommercial educational station that receives a grant ... [from] engage[ing] in editorializing" violated the First Amendment. 468 U.S. at 366, 104 S.Ct. at 3110.

The government sought to justify this rule by construing *TWR* as allowing Congress "in the proper exercise of its spending power, [to] simply determin[e] that it 'will not subsidize public broadcasting station editorials." *Id.* at 399, 104 S.Ct. at 3127. The Court rejected the government's argument reasoning that *TWR* 's holding hinged on the fact that the organizations that lobbied "remained free 'to receive [tax-]deductible contributions to support nonlobbying activit[ies]" by creating two separate entities, one under § 501(c)(3) and another under § 501(c)(4). *Id.* at 399–400, 104 S.Ct. at 3127 [brackets in the original]. The Court concluded that "[g]iven that statutory alternative," the restriction in *TWR* passed constitutional muster. *Id.* at 400, 104 S.Ct. at 3128.

In contrast, the Court found that the CPB prohibition against editorializing precluded a station from segregating its editorializing ac-

---

12. The very essence of the doctrine—that the government does not have absolute discretion in its funding decisions—undermines the LSC's argument that it has a constitutional right not to speak. *See* LSC's opposition at pg. 35. After all,

if the government did have a right not to speak, Congress' decisions on funding would be entitled to constitutional protection and could not be challenged.

tivities from its noneditorialzing activities. *Id.* Thus, "a noncommercial educational station that receives only 1% of its overall income from CPB grants is barred absolutely from editorializing." *Id.* Based on the inability to segregate, the Court found the CPB restriction to be an unconstitutional condition. *Id.* ("The station has no way of limiting the use of its federal funds to noneditorializing activities, and, more importantly, it is barred from using even wholly private funds to finance its editorial activity.") In fact, the Court even discussed how the CPB scheme could pass constitutional muster if "noncommercial educational broadcasting stations [were permitted] to establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds." *Id.*

### 3. *Rust v. Sullivan*

The Supreme Court next confronted the unconstitutional conditions doctrine in 1991 in the case of *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

At issue in *Rust* was a regulation promulgated by the Department of Health and Human Services ("HHS") that attached three principal conditions to federal funds for a family planning program known as Title X. 500 U.S. at 179, 111 S.Ct. at 1765. First, the recipient of federal funds could "not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." *Id.* Second, the recipient could "not encourage, promote or advance abortion as a method of family planning." *Id.* at 180, 111 S.Ct. at 1765. This restriction included a ban on any lobbying and the use of any "legal action to make abortion available." *Id.* Third, the recipient of the funds must be "'physically and financially separate' from prohibited abortion activities." *Id.* To determine whether recipients fulfilled the latter requirement, the regulations set forth a list of factors that included "the existence of

separate accounting records and separate personnel, and the degree of physical separation of the project from facilities for prohibited activities." *Id.* at 181, 111 S.Ct. at 1766.

The recipients of these funds and the doctors sued the Secretary of the HHS claiming, *inter alia*, that the regulations (1) impermissibly discriminated based on viewpoint of the recipient; and (2) constituted an unconstitutional condition. The Court rejected both arguments.

With respect to the first argument, the Court held that the government had "not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Id.* at 193, 111 S.Ct. at 1772. The Court further stated that:

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.

*Id.*[13]

In response to the unconstitutional conditions argument, the Court examined whether the restrictions completely denied recipients the right to engage in pro-choice activities. The Court concluded that it did not stating that:

> By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has, consistent with our teachings in *League of Women Voters* and *Regan*, not denied it the right to engage in abortion related activities. Congress has merely refused to fund such activities out of the public fisc, and **the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program.**

**13.** Although the Court does not discuss Plaintiffs' argument concerning viewpoint discrimination (e.g. litigating to reform welfare as opposed to litigating to maintain the status quo), the Court notes that the reasoning in *Rust* seems applicable. *Cf. Rosenberger v. Rector and Visitors of University of Virginia*, —— U.S. ——, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

*Id.* at 198, 111 S.Ct. at 1775 (emphasis added).

4. *Rust, League of Women Voters and TWR stand for the proposition that Congress can select what to subsidize so as long as it does not completely foreclose an organization from using non-federal funds to pursue its un-subsidized viewpoints*

■ As the survey above of the *Rust, League* and *TWR* cases indicate, the dispositive factor that explains the cases' respective results is whether the restrictions left open adequate channels for speech.[14] In *TWR,* the organizations could sever their lobbying activities into a § 501(c)(4) organization while allowing their other functions to maintain their § 501(c)(3) privileges thereby constitutionally salvaging the restrictions. Likewise, in *Rust,* the Court found that the restrictions did not deny the groups the right to engage in abortion-related activities. 500 U.S. at 198, 111 S.Ct. at 1775. In *League,* however, the inability of the stations to create affiliates transformed the ban on editorializing into an unconstitutional condition. 468 U.S. at 400, 104 S.Ct. at 3128.

In this case, therefore, the Plaintiffs' likelihood of success rests on their ability to prove that the LSC restrictions prevent the organizations and lawyers from voicing their un-subsidized opinions.

C. *Where do the LSC restrictions fall along the League, Rust and TWR continuum regarding the availability of adequate channels of speech?*

■ The adequacy of the alternative channels surely depends on the entity involved.[15] In examining the Plaintiffs' likelihood of success, however, the Court will examine whether adequate, alternative channels exist for the organizations to voice their un-subsidized opinion.[16]

In examining the opportunity of the organizations to voice their opinions, the Court compares them to the organizations in *League, TWR,* and *Rust.* Upon deeper observation, the Court finds that the organizations in those cases comprise a continuum of the availability of alternate channels with *League* on one end (no alternate channels), *TWR* on the other (alternate channels readily obtainable), and *Rust* in the middle (alternate channels theoretically obtainable).

1. *The LSC's regulations narrow the availability of alternate channels more than the § 501(c)(3) regulations did in TWR*

Clearly, the LSC's regulations narrow the availability of alternate channels more than the § 501(c)(3) regulations did in *TWR.* In *TWR,* a group that wanted to lobby needed only to create a § 501(c)(4) organization and "keep records to show that tax deductible contributions [the 501(c)(3) funds] [we]re not used to pay for lobbying [the § 501(c)(4) activities]." 461 U.S. at 544 n. 6, 103 S.Ct. at 2000 n. 6. As the Supreme Court pointed out,

14. The LSC agrees with the Court's rule but argues that the statutory scheme allows Plaintiffs to establish alternate entities. *See* LSC's Opposition at pg. 15–21.

15. For example, the individual lawyers' (Lloyd Van de Car and Gary F. Smith) likelihood of success seems smaller than the legal aid organizations' likelihood of success. Under the unconstitutional condition jurisprudence, the individual lawyers have adequate alternative channels, i.e., their own free time, in which to voice their opinions. However unreasonable this view may be, this Court finds that the Supreme Court clearly adopted it in *Rust:*

> The regulations, which govern solely the scope of the Title X project's activities, do not in any way restrict the activities of those persons acting as private individuals. The employees' freedom of expression is limited during the

time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority.

500 U.S. at 198–99, 111 S.Ct. at 1775.

16. The Court firmly rejects the LSC's argument which seemed to suggest that corporations are not entitled to First Amendment protection. The Supreme Court has clearly stated that the determination of whether speech comes within the purview of the First Amendment does not depend on the entity that utters it but on whether the state seeks "to abridge speech that the First Amendment is designed to protect." *See Pacific Gas & Elec. v. P.U.C. of California,* 475 U.S. 1, 8, 106 S.Ct. 903, 907, 89 L.Ed.2d 1 (1986); *see also First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 776–78, 98 S.Ct. 1407, 1415–16, 55 L.Ed.2d 707 (1978).

these regulations were "not unduly burdensome." *Id.*

In contrast, the LSC regulations look beyond whether the funds of a recipient are kept separately from other organizations that may engage in prohibited activities. Instead, the LSC prohibits an organization from creating another organization to pursue prohibited activities if the first organization maintains "direct or indirect ability to: (a) Determine the direction of management and policies; or (b) influence the management or policies of ... [the second organization] to the extent that an arm's length transaction may not be achieved." *See* 50 Fed.Reg. 49279 (1985). In making this determination, the LSC examines eight factors including: "(c) History of relationships among the organizations (e.g. the fact that one organization provided initial funding and named initial directors of another would be a relevant factor; as would facts relating to decision-making on policies or transactions of mutual interest; actual control of particular decisions); [and] (d) Close identity of interest." [17] *Id.* By focusing on influence as opposed to the provision of funds, the LSC reduces the availability of alternative channels more than the IRS did in *TWR.* Thus, this case falls on the unconstitutional side of *TWR* on the availability of alternate channels continuum.

2. *The factors employed by the LSC in determining interrelatedness of organizations coupled with the regulations in Rust suggest that the LSC restricts the availability of alternative channels more than the regulations did in Rust*

The more difficult question (and the more contested between the parties) consists of what side of the continuum this case falls with regard to *Rust.* To begin with, the regulations in *Rust* stated that "mere bookkeeping separation of title X funds from other monies is not sufficient." 42 C.F.R. § 59.9 (1995) Rather, the *Rust* regulations inquired into whether the funded project had "objective integrity and independence from prohibited activities." *Id.* The regulation in *Rust* relied upon four factors to determine "objective integrity":

> (a) The existence of separate accounting records; (b) The degree of separation from facilities (e.g. treatment, consultation, examination, and waiting rooms) in which prohibited activities occur and the extent of such prohibited activities; (c) The existence of separate personnel; and (d) The extent to which signs and other forms of identification of the title X project are present and signs material promoting abortion are absent.

*Id.*

In its opposition, LSC states that its "interrelated organizations policy is less strict than the structural separation rules upheld in *Rust.*" *See* LSC's Opposition at pg. 19. In support of this assertion, LSC argues that its regulations do not contain a counterpart to regulation (c) of *Rust* which stated that the "existence of separate personnel" should be considered in determining "objective integrity."

Technically, the LSC is correct, its regulations do not explicitly set forth that the overlap of personnel between the two organizations should be examined. Yet, taken as a whole, the requirements implicitly (and sometimes explicitly) impose such a standard. Explicitly, the LSC regulations state that the "overlap of officers, directors, or other managers among organizations" should be considered. 50 Fed.Reg. 49279. This rule in a practical sense acts in the same way as the separate personnel factor did in *Rust.* After

---

**17.** The other factors are: "(a) Extent and pattern of any overlap of officers, directors, or other managers among organizations; (b) Contractual and financial relationships (especially in terms of the proportion of a possibly controlled organization's funds or resources that are provided by the controlling organization); ... (e) One organization has become a mere conduit, 'incorporated pocketbook,' or 'straw' party for another whether or not there was an attempt to work an injustice or promote a fraud; (f) Funds are solicited by a separate entity in the name of and with the expressed or implicit approval of the recipient and substantially all of the funds solicited are intended by the contributor or are otherwise required to be transferred to the recipient or used at its discretion or direction; (g) A recipient transfers resources to another entity that holds these resources for the benefit of the recipient; and (h) A recipient assigns functions to an entity whose funding is primarily derived from sources other than public contributions." 59 Fed.Reg. 49279.

all, the only legal aid employees likely to have the experience, wherewithal, commitment and reputation to begin their own legal aid foundations are officers, directors and managers.

Yet, even in the unlikely situation that a non-manager decided to open a legal aid agency, and further decided to hire personnel from the other legal aid foundation, the LSC restrictions would probably still apply. First, to hire away the workers from the first organization, there would need to be a "close identity of interest." *See* 59 Fed.Reg. 49279 1–7(d). Obviously, employees of the first organization are not likely to join the second organization unless the interests of the organizations coincide. Moreover, the second organization would arguably transgress the "history of relationships among the organizations" factor. Thus, although the LSC regulations do not explicitly forbid the overlap of employees, the broad definition of interrelatedness, in practice, serves to prevent one organization from having the same personnel of another. In that regard, the LSC regulations cannot be said to be more liberal than those in *Rust.*

On the contrary, the *Rust* regulations appear far more expansive in allowing an organization to pursue its abortion-related speech than the LSC is in allowing a legal aid foundation to, say, lobby for welfare reform. For instance, in regulation, 42 C.F.R. § 59.10, entitled "Prohibition on activities that encourage, promote or advocate abortion," the HHS provides a few examples of what is allowed under the regulations. These examples are telling. Example 4 states as follows:

An organization conducts a number of activities, including operating a title X project. The organization uses non-project funds to pay dues to an association which among other activities, engages in lobbying to protect and expand the legal availability of abortion as a method of family planning. The association spends a significant amount of its annual budget on such activi-

ty. Payment of dues to the association by the organization does not violate ... this section.

42 C.F.R. § 59.10(b)(4). Example 5 states as follows:

An organization that operates title X project engages in lobbying to increase the legal availability of abortion as a method of family planning. The project itself engages in no such activities and the facilities and funds of the project are separate from the prohibited activities. The project is not in violation ... of this section.

*Id.* at (b)(5).

Neither of these examples would be permitted under the LSC regulations. In Example 4, the fact that the organization "operates" the Title X project suggests that it would be deemed an interrelated organization by the LSC because to "operate" an entity most likely encompasses the "direct or indirect ability to ... influence the management or policies of the [entity]." Similarly, in example 5, the organization's operation of the Title X entity would, under the LSC's regulations, preclude it from lobbying in violation of the LSC restrictions.

As these regulations make clear, and as the Court pointed out in *Rust,* "Title X expressly distinguishes between a Title X grantee and a Title X project." The LSC regulations do not. In that regard, the LSC regulations fall on the unconstitutional side of *Rust* on the continuum.

**3.** *The expansive view of inter-relatedness among organizations makes the LSC regulations most similar to those in League*

The LSC regulations resemble closest the ones struck down in *League.* In light of the expansive "inter-relatedness" definition, an organization that receives 1% of funding from the LSC is practically prevented from engaging in any of the prohibited activities. This smacks of an unconstitutional condition.[18] Accordingly, the Court finds that

---

**18.** The Court further finds that the Plaintiffs have a significant likelihood of proving that the LSC does not have a reasonable, let alone compelling, interest in preventing Plaintiffs from using non-LSC funds to create a separate organization that could engage in the restricted activities. *See e.g.*

*FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (striking down restriction on editorializing that prevented organizations from using private funds to create a separate organization in which to exercise their First Amendment rights). Because the LSC's

Plaintiffs have a significant likelihood of success in prevailing on their unconstitutional condition argument.[19]

The Plaintiffs' likelihood of success, however, shrinks to "fair" considering the burden they face. Because Plaintiffs challenge the facial validity of the regulations, Plaintiffs "must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid." *Rust*, 500 U.S. at 183, 111 S.Ct. at 1767 [brackets in original] [citations omitted].[20] Nevertheless, the Court finds that the Plaintiffs have established a fair likelihood of establishing that no such circumstances exist.

## II. *Irreparable Injury*

Under the traditional test, Plaintiffs must show "the possibility of irreparable injury ... if relief is not granted" in order to obtain a preliminary injunction. The Plaintiffs' have met this burden.

Failure to partially grant Plaintiffs' preliminary injunction could result in the continued infringement of their First Amendment rights. The Supreme Court has noted that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*

*v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1, at 161 (1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The LSC, however, takes great pains in arguing that *Elrod* should not be applied.[21]

LSC argues, with some persuasion, that Plaintiffs' delay in filing suit "renders their irreparable harm arguments not credible." In support of its argument, LSC relies on *Oakland Tribune, Inc., v. Chronicle Pub. Co.*, 762 F.2d 1374 (9th Cir.1985) which stated that a "Plaintiff's long delay before seeking a preliminary injunction implies lack of urgency and irreparable harm." *Id.* at 1377.

Plaintiffs' have waited nine months before challenging the restrictions imposed by the 1996 and 1997 Budgets. This delay not only sheds some doubt on the Plaintiffs' proclamations of harm but it also impacts the ability of the LSC, and this Court, to thoughtfully analyze the complex issues involved. However, Plaintiffs had to give due consideration to the ramifications should they succeed in obtaining a preliminary injunction; since in prevailing they would upset the compromise Congress reached last year in funding any

---

interest in restricting the non-LSC funds is not even reasonable, deeming the LSC program a public forum will not salvage it. *Perry Educational Association v. Perry Local Educators' Association*, 460 U.S. 37, 47, 103 S.Ct. 948, 956, 74 L.Ed.2d 794 (1983) (holding that the state may regulate a public forum so long as "the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.").

19. The LSC defends its broad inter-related provision by claiming that the "LSC has never applied it to bar a non-grantee from engaging in prohibited activities." *See* Opposition at pg. 20. LSC's purported lack of enforcement, however, does not make the regulation immune from constitutional attack. Rather, Plaintiffs must resort to a facial challenge of the regulations. *See e.g. FCC v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (striking down statute as an unconstitutional condition after facial attack).

20. The Court agrees with the LSC that the Supreme Court's decision in *Osborne v. Ohio* which imposed a duty on courts to adopt narrowing construction of statutes so to save them from possible invalidity applies. The Court, however, finds that even narrowing the regulations at issue here does not save them from invalidity. 495 U.S. 103, 120, 110 S.Ct. 1691, 1702, 109 L.Ed.2d 98 (1990).

21. The Court notes that *Elrod* does not apply to Due Process or Equal Protection violations and thus such violations must undergo traditional irreparable harm analysis. Therefore, even if the restriction concerning class actions implicates Due Process or Equal Protection, the Court finds that Plaintiffs' delay in bringing suit precludes a finding of irreparable harm. In addition, the balance of hardships concerning class actions favors the LSC. The LSC's administrative efforts in ensuring compliance with the class action restriction outweighs the Plaintiffs' hardship of waiting for a final determination on the merits before filing a class action.

moneys to the LSC, which in turn might result in no further funding.

The Court finds that the delay does not undermine Plaintiffs' ability to establish irreparable harm. None of the cases cited by the LSC concerning delay involved a situation where First Amendment freedoms were violated. The *Oakland Tribune* case involved purported antitrust violations. The LSC did cite *Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211 (1984) which involved a First Amendment claim, but no First Amendment violation. In fact, the Ninth Circuit in *Lydo* seemed inclined to find irreparable harm despite the delay but for its disagreement "with the court's conclusion that Lydo has made a showing that First Amendment freedoms are in fact violated." *Id.* at 1214. In this case, however, the Court has found that the Plaintiffs have showed a likelihood of success with regard to their First Amendment claim as to certain restrictions.

The First Amendment, moreover, is the most sacred of all rights conferred in our Constitution. Its violation, if not remedied, can "chill" other citizen's First Amendment rights. For this reason, it cannot be tolerated. Moreover, the *Elrod* holding, in spite of LSC's attacks,[22] still remains the law. *See e.g. San Diego Committee Against Registration and the Draft v. Governing Bd. of Grossmont Union High School Dist.,* 790 F.2d 1471, 1473 n. 3. (1986); *American–Arab*

*Anti–Discrimination v. Reno,* 70 F.3d 1045 (9th Cir.1995). Accordingly, under *Elrod,* the Court finds that Plaintiffs face irreparable harm if the injunctive relief is not granted.[23]

### III. Balance of Hardships

■ Because the Plaintiffs' only established a "fair" chance of success on the merits, they must establish that the balance of hardships tips decidedly in their favor. *See Miller,* 19 F.3d at 456. Plaintiffs have met this burden.

The hardships faced by the Plaintiffs far outweigh LSC's hardship in not imposing its restrictions, many of which may be unconstitutional. The LSC will only be prevented from imposing its restrictions concerning non-LSC funds until the Court makes a final determination on the merits.

The arguments proffered by the LSC do not alter the Court's conclusion concerning the balance of hardships. The LSC may have "a strong interest in orderly administration of its grantee programs" and it may want to allocate Congressional resources in accordance with the priorities set by Congress but these interests do not outweigh Plaintiffs' constitutional rights.[24] *See* Opposition at pg. 57–58. The Court does concur with the LSC's fourth rationale—"that noncompliance may have serious, adverse repercussions for continuing [LSC] appropriations"—but Congress' possible cessation of

---

**22.** *See* LSC's opposition at pg. 50.

**23.** Plaintiffs' irreparable harm argument does not rely solely on the theoretical harm of their First Amendment rights. Rather, Plaintiffs have included numerous declarations that support a finding of great hardship. For instance, Plaintiffs have established that they will suffer irreparable harm if not allowed to lobby for welfare reform. In the wake of federal block grants for welfare, the states' effort in re-formulating welfare will establish an entirely new welfare system. The states are currently in the process of formulating these policies. For instance, the deadline for submitting bills to the California legislature is February 28, 1997, a mere two weeks after the hearing. *See* Plaintiff's Reply to Response of the United States, Declaration of Roberta Ranstrom. If the injunction is not issued, the Plaintiffs will miss the opportunity to submit a bill and affect the process.

Defendants argue that the organizations will not suffer irreparable harm by the ongoing wel-

fare debate because "Plaintiffs are free to engage in the welfare debate if they accept no LSC funds." *See* LSC's opposition at pg. 52. This argument completely misses the point. By foregoing the LSC funds to engage in their First Amendment freedoms, the Plaintiffs will suffer the harm of losing up to half of their income in exchange for exercising their First Amendment rights. This loss of income could result in significant cutbacks for the Plaintiffs in services and employees. Although Plaintiffs have no "entitlement" to the funds, the LSC cannot deny that the loss of funds, especially when the restrictions may violate the Constitution, does not rise to irreparable harm.

**24.** The Court also disagrees with the third reason proffered by the LSC for not issuing the injunction, i.e. that it prevents "the enforcement of a validly-enacted law."

funding to the LSC cannot justify condoning Congress' imposition of unconstitutional conditions on the Plaintiffs. *See* LSC's Opposition at pg. 59.

The Plaintiffs, on the other hand, face a continual infringement of their First Amendment rights as to certain restrictions. Plaintiffs also face the prospect of providing no input on the welfare debate that promises to re-structure welfare 'as we know it.' Moreover, if Plaintiffs decide they cannot abide by the LSC's restrictions (and lobby for welfare), the Plaintiffs will lose all federal funding. For many of these organizations, the loss of funding will seriously impair their ability to provide the same level of services to their clients.[25]

Consequently, the Court finds that the balance of hardships tips decidedly in favor of the Plaintiffs.

## IV. *Public Interest*

■ The Court also finds that the public interest favors the Plaintiffs. The public interest favors a vibrant marketplace of ideas where qualified, knowledgeable legal aid organizations are not foreclosed from representing the best interests of the indigent in the legislative and judicial arena. Moreover, there is a strong public interest in assuring that the channels of government are open to people whose legal rights have been or may be adversely affected by government action. Lastly, perhaps no greater public interest exists than protecting a citizen's rights under the constitution.

The furtherance of the public interest in addition to the balance of hardships and the Plaintiffs' fair likelihood of success entitles the Plaintiffs' to preliminary injunctive relief on the restrictions that implicate constitutional rights.

## CONCLUSION

For the foregoing reasons, the Court grants in part Plaintiffs' motion for injunctive relief. Accordingly, the Court enjoins the LSC from enforcing the following restric-

tions, but only to the extent that they relate to the use of Non–LSC funds, set forth in the 1996 and 1997 Budgets:

(1) advocating or opposing any reapportionment of a legislative, judicial or elective district on any level, 1996 Budget § 504(a)(1)

(2) influencing the "issuance, amendment, or revocation of any executive order", 1996 Budget § 504(a)(2)

(3) "attempt[ing] to influence any part of any adjudicatory proceeding of any Federal, State, or local agency," 1996 Budget § 504(a)(3)

(4) attempting "to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative ... of the Congress or a State or a local legislative body" 1996 Budget Act (a)(4)

(5) litigating or lobbying in an effort to reform the federal or state welfare laws or systems, 1996 Budget § 504(a)(16)

(6) "conduct[ing] a training program for the purpose of advocating a particular public policy or encouraging a political activity", 1996 Budget § 504(a)(12)

(7) "participating in any litigation on behalf of a person incarcerated in a Federal, State, or local prison", 1996 Budget Act § 504(a)(15)

(8) representing people allegedly engaged in certain illegal drug activity in public housing eviction proceedings, 1996 Budget Act § 504(a)(16)

(9) "participat[ing] in any litigation with respect to abortion," 1996 Budget Act § 504(a)(14).

The Court makes the attached additional findings of fact and conclusions of law as part of this ruling.

IT IS SO ORDERED.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION*

This matter was heard on the motion of Legal Aid Society of Hawaii, Legal Services

---

**25.** For example, without federal funding, LASH will have to close approximately one-half of its offices on three of the six islands of Hawaii. *See*

Plaintiff's Reply, Declaration of M. Victor Geminiani, pg. 2.

of Northern California, Inc., San Fernando Valley Neighborhood Legal Services, Legal Aid Society of Orange County, Alaska Legal Services Corporation, Lloyd Van De Car, Gary F. Smith, The Hawaii Justice Foundation, The Impact Fund, and California State Client Council ("Plaintiffs"), pursuant to Federal Rules of Civil Procedure 7 and 65(a), for a Preliminary Injunction enjoining Defendant Legal Services Corporation ("LSC") from enforcing restrictions on the use by Plaintiffs of public and private funds to the extent not previously restricted (Non–LSC Funds) during the pendency of this action.

Having considered the papers and arguments of counsel, and being fully advised, the Court hereby finds and concludes as follows:

### FINDINGS OF FACT

1. There exists a great and substantial need for the provision of legal services to the poor.

2. The plaintiff legal service organizations and attorneys are an essential, and sometimes the only, source of legal services for the poor in the respective communities they serve in areas such as housing, employment, health care, education and welfare. Without such services, the poor are unlikely to satisfy their most elemental needs and protect their most basic legal interests.

3. The plaintiff legal services organizations and attorneys have provided, and but for the challenged provisions of federal law would continue to provide, legal services for the poor in litigation, mediation, counseling, negotiation, and legislative and administrative advocacy.

4. Each of the plaintiff legal services organizations receives a portion of its funding from LSC and a portion of its funding from other sources, including state and local governments, charitable foundations, the private bar and Interest On Lawyers' Trust Accounts. Non–LSC Funds are essential to allow the plaintiff legal services organizations and their attorneys to provide effective services to the poor in the communities they serve. Each of the plaintiff legal services organizations and attorneys is ready and able to segregate their federal funds from their Non–LSC Funds and to avoid commingling them. Each of the plaintiff legal services organizations is ready and able to engage in those types of advocacy which are prohibited under the challenged federal restrictions, relying solely upon Non–LSC Funds to support such efforts.

5. The enforcement of restrictions on the use of Non–LSC Funds by the plaintiff legal services organizations and attorneys has had and, if not enjoined, will continue to have an irreparable adverse effect upon the ability of the plaintiff legal services organizations and attorneys to provide services to their clients and prospective clients in the types of disputes and the types of proceedings prohibited under the federal restrictions.

6. If the challenged federal restrictions limit the use of Non–LSC Funds, innumerable existing and potential legal services clients will be deprived of adequate legal representation and the ability to protect their legal rights.

7. Enforcement of some of the restrictions as they relate to the use of Non–LSC Funds pending trial will seriously and irreparably harm the interests and rights of plaintiffs and will adversely affect the public interest, in that, among other things, the exercise of plaintiffs' constitutional rights will be impaired, the ability of the poor to obtain effective legal representation will be adversely affected and the operation of the federal and state judicial systems will be restricted and impaired.

### CONCLUSIONS OF LAW

1. Based on the foregoing Findings of Fact and the Conclusions of Law set forth hereafter, the Court concludes that Plaintiffs have established (a) there is a substantial likelihood that they will prevail on the merits at trial with regard to certain restrictions; (b) that, absent an injunction, they will suffer great and irreparable injury; and (c) that the balance of hardship tips substantially in their favor.

2. Plaintiffs, and each of them, have a constitutionally protected right under the First Amendment: to associate with each other to petition the government for redress

of grievances, to file lawsuits, to engage in legislative and administrative advocacy and to associate with each other in pursuit of these constitutionally-protected interests.

3. The following restrictions implicate Plaintiffs' First Amendment rights to lobby:

(1) advocating or opposing any reapportionment of a legislative, judicial or elective district on any level, 1996 Budget § 504(a)(1)

(2) influencing the "issuance, amendment, or revocation of any executive order", 1996 Budget § 504(a)(2)

(3) "attempt[ing] to influence any part of any adjudicatory proceeding of any Federal, State, or local agency," 1996 Budget § 504(a)(3)

(4) attempting "to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative ... of the Congress or a State or a local legislative body" 1996 Budget Act(a)(4)

(5) litigating or lobbying in an effort to reform the federal or state welfare laws or systems, 1996 Budget § 504(a)(16).

4. The First Amendment, as interpreted by the Supreme Court in *Button* and *In re Primus,* also protects the right to associate for the purpose of engaging in litigation as a form of political expression. This right is implicated by the LSC restrictions that prohibit legal aid organizations from:

(1) "conduct[ing] a training program for the purpose of advocating a particular public policy or encouraging a political activity", 1996 Budget § 504(a)(12)

(2) "participating in any litigation on behalf of a person incarcerated in a Federal, State, or local prison", 1996 Budget Act § 504(a)(15)

(3) representing people allegedly engaged in certain illegal drug activity in public housing eviction proceedings, 1996 Budget Act § 504(a)(16)

(4) "participat[ing] in any litigation with respect to abortion", 1996 Budget Act § 504(a)(14).

5. The Court, however, finds that neither the First Amendment, Due Process or Equal Protection prevent Congress from prohibiting the legal aid organizations from:

(1) representing certain aliens except in cases of domestic violence, 1996 Budget § 504(a)(11)

(2) claiming or collecting attorney's fees; 1996 Budget Act § 504(a)(13)

(3) initiating or participating in a class action lawsuit, 1996 Budget § 504(a)(7).

Nor do these Constitutional rights prevent Congress from requiring that a written statement of facts be prepared by the legal aid organizations prior to initiating litigation or pre-litigations negotiations. 1996 Budget Act § 504(a)(8).

6. It is substantially likely that the restrictions which implicate constitutional rights imposed by Congress on the use of Non–LSC Funds by or for the benefit of Plaintiffs represents an unconstitutional condition in violation of Plaintiffs' right under the First Amendment in that it conditions the availability of LSC funds on the agreement of Plaintiffs to relinquish their First Amendment rights as identified above. Such condition is not supported by a compelling interest.

7. It is substantially likely that the restrictions on the use of Non–LSC Funds are also unconstitutional in that they do not merely limit the use which can be made of LSC funds but place restrictions upon LSC grantees and affiliates of LSC grantees.

8. The restrictions on the use of Non–LSC Funds have had, and will continue to have, an immediate and significant adverse effect upon Plaintiffs' constitutionally protected rights as more fully described above. In the absence of a preliminary injunction, Plaintiffs will suffer irreparable injury which is not capable of redress through any other legal remedy.

9. There is a strong public interest in maintaining an independent and effective judicial system and in assuring that the channels of government are open to people whose legal rights have been or may be adversely affected by government action. Therefore, the public interest will also be served by granting a preliminary injunction.

10. Defendant LSC will not suffer any substantial harm if a partial preliminary in-

junction is issued in that it will remain able to restrict and monitor the use of its own funds pending trial.

11. There is no risk of economic harm or damage to LSC in the event this injunction is wrongfully issued. Therefore, no security shall be required from Plaintiffs.

NOW, THEREFORE, based on the foregoing,

IT IS HEREBY ORDERED that, pending trial, Defendant LSC is enjoined from enforcing the following restrictions, but only to the extent that they relate to the use of Non–LSC Funds, of the Omnibus Consolidated Appropriations Act of Fiscal Year 1997, Pub.L. No. 104–208, 110 Stat. 3009, § 502(a), of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321, § 504(d)(1) which prohibit Plaintiffs from:

(1) advocating or opposing any reapportionment of a legislative, judicial or elective district on any level; 1996 Budget Act § 504(a)(1)

(2) influencing the "issuance, amendment, or revocation of any executive order"; 1996 Budget Section 504(a)(2)

(3) "attempt[ing] to influence any part of any adjudicatory proceeding of any Federal, State, or local agency," 1996 Budget § 504(a)(3)

(4) attempting "to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative ... of the Congress or a State or a local legislative body" 1996 Budget Act(a)(4)

(5) litigating or lobbying in an effort to reform the federal or state welfare laws or systems, 1996 Budget § 504(a)(16)

(6) "conduct[ing] a training program for the purpose of advocating a particular public policy or encouraging a political activity", 1996 Budget § 504(a)(12)

(7) "participating in any litigation on behalf of a person incarcerated in a Federal, State, or local prison", 1996 Budget Act § 504(a)(15)

(8) representing people allegedly engaged in certain illegal drug activity in public housing eviction proceedings, 1996 Budget Act § 504(a)(16)

(9) "participat[ing] in any litigation with respect to abortion", 1996 Budget Act § 504(a)(14). and regulations implementing these provisions that restrict plaintiffs' use of funds obtained from sources other than LSC.