**LEGAL AID SOCIETY of HAWAII, Legal Services of Northern California, Inc., San Fernando Valley Neighborhood Legal Services, Legal Aid Society of Orange County, Alaska Legal Services**

Corporation, California State Client Council, The Hawaii Justice Foundation, The Impact Fund, and Gary F. Smith, Plaintiffs–Appellants,

v.

LEGAL SERVICES CORPORATION, Defendant–Appellee,

UNITED STATES of America, Intervenor–Appellee.

No. 97–16567.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 13, 1998.

Decided May 18, 1998.

Stephen V. Bomse, Charles N. Freiberg, Adam M. Cole, Hope L. Hudson, Rakesh K. Anand, Heller Ehrman White & McAuliffe, San Francisco, CA, Paul Alston, Bradford L. Tannen, Alston Hunt Floyd & Ing, Honolulu, HI, Stanley E. Levin, Davis Levin Livingston Grande, Honolulu, HI, Steven R. Shapiro, Robin L. Dahlberg, New York City, and Margaret C. Crosby, San Francisco, CA, for plaintiffs-appellants.

Thomas S. Williamson, Jr., Robert A. Long, Jr., Georgia Kazakis, Ernest A. Young, Erika F. King, Covington & Burling, Washington, DC, for defendant-appellee.

Matthew M. Collette, Frank W. Hunger, Steven S. Alm, Stephen W. Preston, Barbara L. Herwig, Dept. of Justice, Washington, DC, for intervenor-appellee.

David M. Young, Daniel J. Popeo, Washington, DC, for Washington Legal Foundation, Allied Educational Foundation, and U.S. Representative Bill McCollum as amici curiae in support of appellees.

Before: WHITE,* Associate Justice, (Ret.), NOONAN and THOMAS, Circuit Judges.

WHITE, Associate Justice, (Ret.).

The issue presented in this appeal is whether government restrictions on the activities of organizations who accept funds distributed by the Legal Services Corporation (LSC) are facially unconstitutional. Appellants, a group of organizations and an individual involved in the provision of legal services to indigent persons, contend that the restrictions impose unconstitutional conditions on the exercise of their First Amendment rights and violate equal protection and due process rights protected by the United States Constitution. We affirm the judgment of the district court that the restrictions do not violate the First Amendment.

---

* The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

We vacate and remand the judgment of the district court that the restrictions do not violate the constitutional rights of indigent persons because appellants fail to establish their standing to raise the rights of their clients.

## I. BACKGROUND

In 1974, Congress enacted the Legal Services Corporation Act, 42 U.S.C. §§ 2996 *et seq.* The Act established the LSC as a private nonprofit corporation "for the purpose of providing financial support for legal assistance in noncriminal proceedings ... to persons financially unable to afford legal assistance." § 2996b. The LSC receives funds annually from Congress and makes grants directly to local organizations that provide civil legal assistance to indigent persons. *See* LSC, 1994 Annual Report 1, 5. To obtain LSC funding, local organizations must submit applications describing the legal services they intend to provide with LSC funding. *See* 45 C.F.R. § 1634.3. In the initial Act creating the LSC, Congress placed restrictions on local organizations who received grants from the LSC. For example, LSC funds could not be used by recipients to provide legal assistance in proceedings concerning abortion, desegregation, or military desertion. § 2996f(b)(8)-(10). With certain exceptions for funds received from tribal, "interest on lawyers trust account," and other non-federal sources, these restrictions applied even if the organization's activities were funded with non-LSC funds. *See* § 2996i(c);

45 C.F.R. pt. 1610 (1976); 41 Fed.Reg. 25,-899, 25,901–02 (1976).

This case arises from recent enactments by Congress that place additional limitations on legal service organizations that accept LSC funds. In 1996, as a result of controversy over the activities pursued by some organizations receiving LSC funds, Congress expanded the number of limitations governing recipients of LSC funds. *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, §§ 504, 508, 110 Stat. 1321, 1321–53 to –57, 1321–57 to –58 (1996 Budget Act). The 1996 Budget Act prohibited recipients of LSC funds from, among other things: 1) advocating or opposing the alteration of an elective district, § 504(a)(1); 2) influencing the issuance of any regulation by any Federal, State, or local agency, § 504(a)(2); 3) influencing any part of any agency adjudicatory proceeding if the proceeding concerns the formulation or modification of any policy of general applicability, § 504(a)(3); 4) influencing the passage or defeat of any legislation, § 504(a)(4); 5) participating in a class action suit, § 504(a)(7); 6) representing certain aliens, § 504(a)(11); 7) claiming or collecting attorneys' fees pursuant to laws requiring the award of such fees, § 504(a)(13); 8) participating in abortion litigation, § 504(a)(14); 9) participating in litigation on behalf of a prisoner, § 504(a)(15); 10) participating in efforts to reform a welfare system, § 504(a)(16); and 11) defending a person in eviction proceedings if the person is involved in illegal drug activity, § 504(a)(17).[1] Congress reenacted

---

1. Section 504 of the 1996 Budget Act states in pertinent part:

SEC. 504. (a) None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any person or entity (which may be referred to in this section as a "recipient")-

(1) that makes available any funds, personnel, or equipment for use in advocating or opposing any plan or proposal, or represents any party or participates in any other way in litigation, that is intended to or has the effect of altering, revising, or reapportioning a legislative, judicial, or elective district at any level of government....;

(2) that attempts to influence the issuance, amendment, or revocation of any executive order, regulation, or other statement of general applicability and future effect by any Federal, State, or local agency;

(3) that attempts to influence any part of any adjudicatory proceeding of any Federal, State, or local agency if such part of the proceeding is designed for the formulation or modification of any agency policy of general applicability and future effect;

(4) that attempts to influence the passage or defeat of any legislation, ... initiative, or any similar procedure of the Congress or a State or local legislative body;

(5) that attempts to influence the conduct of oversight proceedings of the Corporation or any person or entity receiving financial assistance provided by the Corporation;

(6) that pays for any personal service, advertisement, telegram, telephone communication, letter, ... or related expense, associated with an activity prohibited in this section;

these restrictions in the Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104–208, § 502(a), 110 Stat. 3009, 3009–59 to –60 (1996).[2]

Enactment of these restrictions prompted the LSC to promulgate new regulations to ensure that recipients of LSC funding did not use funds received from the LSC to support prohibited activities. Under LSC regulations existing prior to the enactment of the 1996 Budget Act, funds held by organizations under the "control" of an organization receiving LSC funds were "subject to the same restrictions as if the funds were held by the recipient." Audit and Accounting Guide for Recipients and Auditors, 50 Fed. Reg. 49,276, 49,280 (1985). The LSC defined "control" as the ability to "[d]etermine the direction of management and policies" or "influence the management or policies" of another organization "to the extent that an arm's length transaction may not be

achieved." Id. at 49,279. Under the LSC's initial implementation of the 1996 Budget Act, the restrictions enacted by Congress applied to any organization "interrelated," as determined by application of the "control" test, with a recipient of LSC funds. See Legal Aid Soc'y of Hawaii v. Legal Servs. Corp., 961 F.Supp. 1402, 1415 (D.Haw.1997).

On January 9, 1997, appellants filed suit against the LSC in the United States District Court for the District of Hawaii challenging the facial constitutionality of the restrictions and implementing regulations. The plaintiffs consisted of five legal service organizations that receive a portion of their funds from the LSC,[3] a group representing legal services clients,[4] two organizations that fund work by legal services organizations,[5] and two lawyers employed by legal services organizations.[6] They asserted that the restrictions imposed an unconstitutional condition on their First

(7) that initiates or participates in a class action suit;

. . . . .

(11) that provides legal assistance for or on behalf of any alien, unless the alien is present in the United States and [meets certain specified exceptions];

. . . . .

(12) that supports or conducts a training program for the purpose of advocating a particular public policy or encouraging a political activity, a labor or antilabor activity, a boycott, picketing, a strike, or a demonstration, including the dissemination of information about such a policy or activity, except that this paragraph shall not be construed to prohibit the provision of training to an attorney or a paralegal to prepare the attorney or paralegal to provide-
 (A) adequate legal assistance to eligible clients; or
 (B) advice to any eligible client as to the legal rights of the client;
(13) that claims (or whose employee claims), or collects and retains, attorneys' fees pursuant to any Federal or State law permitting or requiring the awarding of such fees;
(14) that participates in any litigation with respect to abortion;
(15) that participates in any litigation on behalf of a person incarcerated in a Federal, State, or local prison;
(16) that initiates legal representation or participates in any other way, in litigation, lobbying, or rulemaking, involving an effort to reform a Federal or State welfare system, except that this paragraph shall not be construed to preclude a recipient from representing an individual eligible client who is seeking specif-

ic relief from a welfare agency if such relief does not involve an effort to amend or otherwise challenge existing law in effect on the date of the initiation of the representation;
(17) that defends a person in a proceeding to evict the person from a public housing project if-
 (A) the person has been charged with the illegal sale or distribution of a controlled substance; and
 (B) the eviction proceeding is brought by a public housing agency because the illegal drug activity of the person threatens the health or safety of another tenant. . . . ;

2. Congress also reenacted the restrictions in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub.L. No. 105–119, § 502(a), 111 Stat. 2440, 2510–11 (1997).

3. Legal Aid Society of Hawaii, Legal Services of Northern California, Inc., San Fernando Valley Neighborhood Legal Services, Legal Aid Society of Orange County, and Alaska Legal Services Corporation.

4. California State Client Council.

5. The Hawaii Justice Foundation and The Impact Fund.

6. Gary F. Smith and Lloyd Van De Car. The parties stipulated to the dismissal of Mr. Van De Car on appeal based on his discontinuation of employment with the Legal Aid Society of Hawaii.

Amendment rights, and violated the equal protection and due process rights of their clients. Appellants requested a preliminary injunction to prevent the LSC from enforcing the restrictions.

On February 14, 1997, the district court granted in part and denied in part appellants' request for a preliminary injunction. The court concluded that the LSC's "interrelated organization" regulation did not provide a recipient of LSC funds with the ability to form an affiliate organization to pursue prohibited activities with non-LSC funds. *See id.* at 1416–17. The district court held that it was substantially likely that the restrictions placed an unconstitutional condition on appellants' First Amendment rights by conditioning the availability of LSC funds on the relinquishment of those rights. *See id.* at 1421. The district court enjoined numerous restrictions contained in the Acts. *See id.* at 1422.

In response to the district court's ruling, the LSC revised the regulations governing the ability of organizations who receive funds from the LSC, known as "recipients," to maintain relationships with organizations pursuing prohibited activities, organizations we will refer to as "unrestricted organizations." The final rule issued by the LSC "nullified" its prior policy on "interrelated organizations" and adopted "program integrity" regulations modeled on the regulations upheld in *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). 62 Fed. Reg. 27,695, 27,695, 27,697–700 (1997). The new regulations mandate that a recipient of LSC funds maintain physical and financial separation from unrestricted organizations. *See* 45 C.F.R. § 1610.8. To determine if the organizations are separate, the LSC will examine certain factors, such as the existence of separate personnel and facilities. In addition, the unrestricted organization must be a legally separate entity. § 1610.8(a)(1).

After the issuance of the new regulations, the United States intervened in the district court to defend their constitutionality. In ruling on cross-motions for summary judgment filed by the parties, the district court concluded that *Rust* was dispositive on the constitutionality of the LSC requirement that a recipient have separate personnel and facilities from an unrestricted organization. *See Legal Aid Soc'y of Hawaii v. Legal Servs. Corp.,* 981 F.Supp. 1288, 1294 (D.Haw.1997). The court upheld the requirement that the unrestricted organization be a "legally separate entity," 45 C.F.R. § 1610.8(a)(1), which was not a part of the regulations challenged in *Rust,* because the requirement did not prevent appellants from exercising their constitutional rights, and the additional burden imposed by the separate incorporation requirement was insignificant. 981 F.Supp. at 1297. The district court rejected the due process and equal protection arguments presented by appellants. The court granted the summary judgment motions of the LSC and the United States, and denied appellants' motion. The court also dissolved its earlier injunction.

This appeal followed.

## II. STANDARD OF REVIEW

■ We review the grant of summary judgment de novo. *Everson v. United States,* 108 F.3d 234, 236 (9th Cir.1997). The decision that a statute is constitutional is a question of law that is reviewed de novo. *United States v. Michael R.,* 90 F.3d 340, 343 (9th Cir.1996).

## III. DISCUSSION

■ We begin, as the Supreme Court did in *Rust,* by discussing the posture of this case. Appellants bring a *facial* challenge to the restrictions and therefore must satisfy a stringent standard:

> Petitioners face a heavy burden in seeking to have the regulations invalidated as facially unconstitutional. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid."

*Rust,* 500 U.S. at 183, 111 S.Ct. 1759 (quoting *United States v. Salerno,* 481 U.S. 739, 745,

107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). It bears emphasizing that, under *Rust*, even if appellants presented a factual situation that suggested the restrictions were unconstitutional in only limited circumstances (and we do not hold that they have presented such circumstances), we would not strike down the restrictions as unconstitutional.

### A. The Unconstitutional Conditions Challenge

█ The United States Constitution vests Congress with the power to spend for the "general Welfare of the United States." Art. I, § 8, cl. 1. Congress has broad power to appropriate funds and define the limits of programs supported by public funds. *See South Dakota v. Dole,* 483 U.S. 203, 206–07 & n. 2, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987); *Rust,* 500 U.S. at 194, 111 S.Ct. 1759.

█ Appellants' primary argument is that the restrictions imposed on those organizations who choose to receive LSC funds violate the First Amendment by prohibiting recipients from using non-LSC funds to engage in activities protected by the First Amendment, such as the right of legal services organizations and their attorneys to lobby legislators and administrators, *see California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 513, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), or express their views on matters of public concern.[7] Appellants claim that the restrictions are unconstitutional because they condition the receipt of a benefit, in this case the grant of federal funds, on the relinquishment of the right to engage in protected activities. They claim this case fits within the Supreme Court's statement in *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), that "even though the government may deny [a] benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech." *Id.* at 597, 92 S.Ct. 2694.

Appellants' unconstitutional conditions argument is without merit because neither the congressional enactments nor the implementing regulations infringe on First Amendment rights. The regulations promulgated by the LSC to preserve the distinction between restricted and unrestricted organizations are nearly identical to the regulations upheld in *Rust* and there is no basis for distinguishing this case from *Rust.*

The regulations challenged in *Rust* governed implementation of the Title X program, which provided grants to projects offering family planning services. 500 U.S. at 178, 111 S.Ct. 1759. However, Congress prohibited the use of Title X funds in any program where abortion was a method of family planning. To implement this restriction, the Secretary of the Department of Health and Human Services promulgated regulations to ensure that organizations offering Title X programs maintained a certain degree of separation between Title X programs and programs offering abortion services.

Three principal conditions were placed on grants awarded under Title X. *Id.* at 179, 111 S.Ct. 1759. First, a Title X project could not provide counseling or referrals concerning abortion as a method of family planning. Second, the project could not encourage abortion as a method of family planning, including any lobbying effort or legal action to encourage abortion. Third, under the Secretary's "program integrity" regulations, Title X projects were required to have objective integrity and independence from prohibited activities. *Id.* at 180, 187, 111 S.Ct. 1759.

The regulations at issue in *Rust* for determining "program integrity" stated:

Maintenance of program integrity.

A title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited [by statute and regulation] from inclusion in the title X program. In order to be physically and

---

**7.** Appellees agree that a significant number of the restrictions implicate First Amendment

rights.

financially separate, a title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of title X funds from other monies is not sufficient. The Secretary will determine whether such objective integrity and independence exist based on a review of facts and circumstances. Factors relevant to this determination shall include (but are not limited to):

(a) The existence of separate accounting records;

(b) The degree of separation from facilities (*e.g.*, treatment, consultation, examination, and waiting rooms) in which prohibited activities occur and the extent of such prohibited activities;

(c) The existence of separate personnel;

(d) The extent to which signs and other forms of identification of the title X project are present and signs and material promoting abortion are absent.

42 C.F.R. § 59.9 (suspended 1993). The LSC regulations challenged in this case follow the *Rust* regulations closely:

Program integrity of recipient.

(a) A recipient must have objective integrity and independence from any organization that engages in restricted activities. A recipient will be found to have objective integrity and independence from such an organization if:

(1) The other organization is a legally separate entity;

(2) The other organization receives no transfer of LSC funds, and LSC funds do not subsidize restricted activities; and

(3) The recipient is physically and financially separate from the other organization. Mere bookkeeping separation of LSC funds from other funds is not sufficient. Whether sufficient physical and financial separation exists will be determined on a case-by-case basis and will be based on the totality of the facts. The presence or absence of any one or more factors will not be determinative. Factors relevant to this determination shall include but will not be limited to:

(i) The existence of separate personnel;

(ii) The existence of separate accounting and timekeeping records;

(iii) The degree of separation from facilities in which restricted activities occur, and the extent of such restricted activities; and

(iv) The extent to which signs and other forms of identification which distinguish the recipient from the organization are present.

45 C.F.R. § 1610.8(a). Given the similarity of the regulations, the Court's discussion in *Rust* of why the Secretary's regulations were constitutional controls the disposition of this case.

In *Rust*, the Court rejected petitioners' reliance on an unconstitutional conditions argument because the government was not denying a benefit to anyone, but "instead simply insisting that public funds be spent for the purposes for which they were authorized." 500 U.S. at 196, 111 S.Ct. 1759. As in *Rust*, the LSC regulations do not force a recipient to give up prohibited activities; "they merely require that the [recipient] keep such activities separate and distinct from [LSC] activities," *id.* If an organization wishes to engage in prohibited activities, it simply is required to conduct those activities through entities that are separate and independent from the organization that receives LSC funds.

Appellants correctly note that *Rust* distinguished between Title X "grantees," which were normally health-care organizations, and Title X "projects," which received funds under Title X for specific purposes. *Id.; see* Appellants' Opening Br. at 35, 41–42. Under the *Rust* regulations, a "grantee" could continue to engage in prohibited activities if it complied with the Secretary's program integrity regulations. Appellants rely on a difference in terminology between the LSC and Title X regulations to argue that because the LSC regulations apply to "recipients," and not "projects," the regulations are unconstitutional. They find support for their argument in the Court's statement in *Rust* that characterized "unconstitutional conditions" cases as "situations in which the Government

has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." 500 U.S. at 197, 111 S.Ct. 1759.

However, appellants' reliance on the fact that the term "recipients" is employed in the LSC regulations instead of the term "projects" is misplaced. The proper constitutional test does not focus on the particular term used by the government agency, but whether the regulations "effectively prohibit[ ] the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* The LSC regulations pass this test.

First, the *Rust* regulations required that a project supported by Title X funds maintain the same degree of separation from an organization engaging in abortion activities as a recipient of LSC funds must maintain from an unrestricted organization, with the exception that the LSC requires that the unrestricted organization be a "legally separate entity," 45 C.F.R. § 1610.8(a)(1). A recipient of LSC funds may engage in conduct protected by the First Amendment outside the scope of the federally funded program if, as in *Rust,* the recipient sets up a separate entity that complies with the program integrity regulations.

Second, the LSC regulations are consistent with the two cases the Court discussed in *Rust* as standing for the proposition that Congress could not entirely prohibit certain constitutionally protected conduct outside the scope of a federally funded program. In *Regan v. Taxation with Representation of Wash.,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), the Court rejected the argument that a federal statute prohibiting lobbying by organizations who qualified for tax-exempt status under 26 U.S.C. § 501(c)(3) imposed an unconstitutional condition on the receipt of tax-deductible contributions. The Court noted that the prohibition represented a legislative choice to prevent subsidized lobbying with public funds. Under the statute, petitioners could continue lobbying by forming a nonlobbying organization qualified for the tax benefits of § 501(c)(3) and a separate lobbying organization under a less favorable provision of the Internal Revenue Code. However, if the petitioners pursued this option, they "would ... have to ensure that the § 501(c)(3) organization did not subsidize" the unrestricted organization. *Regan,* 461 U.S. at 544, 103 S.Ct. 1997. Moreover, the two organizations would have to be "separately incorporated." *Id.* at 544 n. 6, 103 S.Ct. 1997.

In *FCC v. League of Women Voters of Cal.,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), the Court held that a federal law prohibiting noncommercial television and radio stations from "engag[ing] in editorializing" if they received federal grants violated the First Amendment. *Id.* at 366, 402, 104 S.Ct. 3106. The stations were "barred absolutely from all editorializing" because the stations were not able to "segregate [their] activities according to the source of [their] funding" and thus had "no way of limiting the use of [their] federal funds to all noneditorializing activities." *Id.* at 400, 104 S.Ct. 3106. The stations were "barred from using even wholly private funds to finance [their] editorial activity." *Id.* However, the Court recognized that if Congress permitted the stations to "establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid under the reasoning of [*Regan* ]." *League of Women Voters,* 468 U.S. at 400, 104 S.Ct. 3106.

The LSC regulations are consistent with the decisions in *Regan* and *League of Women Voters.* The regulations simply require that if a recipient wishes to engage in prohibited activities, it must establish an organization separate from the recipient in order to ensure that federal funds are not spent on prohibited activities. Or, as the Court stated in *Rust:*

> By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has, consistent with our teachings in *League of Women Voters* and *Regan,* not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out

of the public fisc, and the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program.

*Rust,* 500 U.S. at 198, 111 S.Ct. 1759. In sum, there is no force to the argument that the use of term "recipients" in the LSC regulations instead of the term "projects" requires us to find the regulations unconstitutional.

■ Appellants contend that our reliance on *Rust* is too simplistic because it ignores the hardship imposed on recipients by the LSC regulations. To support this point, appellants speculate as to how the LSC will apply the regulations. They assert that the "LSC's regulations allow 'affiliated' organizations to conduct restricted activities only in the limited sense of permitting overlapping boards of directors." Appellants' Opening Br. at 42–43. They interpret the regulations as prohibiting "any sharing of staff or facilities." *Id.* at 45. According to appellants, these regulations greatly increase the difficulty of providing legal services. Moreover, appellants contend that engaging in restricted activities will be a financial impossibility in some cases because of the expense of hiring two lawyers to serve rural areas, such as remote regions of Alaska, or the expense of maintaining separate facilities.

We disagree. We need only briefly discuss appellants' allegations because they fail to explain why we should declare the regulations unconstitutional in the context of a *facial* challenge even if we found merit in certain specific factual allegations. "Invalidating any rule on the basis of its hypothetical application to situations not before the Court is 'strong medicine' to be applied 'sparingly and only as a last resort.'" *FCC v. Pacifica Foundation,* 438 U.S. 726, 743, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (opinion of Stevens, J.) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Appellants do not present substantial evidence to support their assertions concerning how the LSC regulations will be interpreted and applied to recipients, and the text of the regulations does not support their categorical arguments.

For example, the program integrity regulations do not state that the organizations are limited to overlapping boards of directors, or that no sharing of staff is permissible. Instead, the regulations state that no factor is determinative and the LSC will make a case-by-case determination. We do not know under what circumstances the LSC will permit a person to work part-time at a recipient organization and part-time at an unrestricted organization. Indeed, there is evidence in the record that the LSC granted permission for an attorney to work part-time at a LSC recipient and also engage in prohibited activities on a part-time basis. *See* Supplemental Excerpts of R. at 34–35 (affidavit of LSC's General Counsel discussing approval of attorney continuing to serve as counsel in a class action after modifying his schedule to work part-time for a LSC recipient).

Presumably, the restrictions make it more difficult for organizations to engage in prohibited activities. However, similar restrictions in *Rust* required that an organization engaging in abortion activities "conduct those activities through programs that are separate and independent from the project that receives Title X funds." 500 U.S. at 196, 111 S.Ct. 1759. The Court did not find it constitutionally significant that the restrictions required the recipient of Title X funds to expend effort to comply with the restrictions. Similarly, the fact that the LSC restrictions may require additional compliance efforts by a recipient if it wishes to engage in prohibited activities furnishes no basis for departing from *Rust.*

■ Moreover, we do not find it significant that the LSC regulations require that the unrestricted organization be a "legally separate entity." 45 C.F.R. § 1610.8(a)(1). *Regan* approved of this specific requirement when it noted that an organization that wanted to engage in prohibited lobbying activities would have to be "separately incorporated" from the organization receiving a more favorable tax subsidy. 461 U.S. at 544 n. 6, 103 S.Ct. 1997. We agree with the district court that the combination of the separate incorporation requirement approved in *Regan* and the program integrity requirements approved in *Rust* "does not create an unconsti-

tutional burden on [appellants'] exercise of their constitutional rights." 981 F.Supp. at 1297. As the district court observed, legal services organizations have significant access to legal counsel, and appellants fail to demonstrate how the requirement of filing incorporation papers for an unrestricted organization imposes any significant burden. *See id.* *Rust* does not suggest that the Title X regulations are the maximum permissible separation requirements that the government can impose and we decline to find that the minor additional requirement present in this case has constitutional significance.

Appellants also attempt to distinguish *Rust* on the grounds that *Rust* involved a government program that "used private speakers to transmit specific information pertaining to its own program," *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Appellants rely on *Rosenberger* to support their claim that the LSC is a program designed to encourage private speech and therefore the restrictions are subject to heightened scrutiny. This analogy to *Rosenberger* is not persuasive. The government in *Rosenberger* "expend[ed] funds to encourage a diversity of views from private speakers," *id.* at 834, 115 S.Ct. 2510, unlike the LSC program where "the government [has] appropriate[d] public funds to promote a particular policy of its own," *id.* at 833, 115 S.Ct. 2510. Like the Title X program in *Rust,* the LSC program is designed to provide professional services of limited scope to indigent persons, not create a forum for the free expression of ideas.

Appellants also seek to escape *Rust* by engrafting a threshold compelling interest test onto *Rust.* They assert that the government may not place restrictions "on the use of *non*-LSC funds to support activities protected by the First Amendment" without a compelling interest. Appellants' Opening Br. at 26. According to appellants, our inquiry into the existence of alternative methods for organizations to engage in prohibited activities is not proper until the government establishes a "compelling need for the restriction." *Id.* at 27. It is true that a recipient of LSC funds may not engage in prohibited activities,

even if those activities are funded from a non-LSC source, unless it complies with the program integrity regulations. However, a similar argument was rejected in *Rust.*

In *Rust,* petitioners argued that the regulations penalized privately funded speech because Title X required grant recipients to contribute funding from other sources to the financing of Title X activities. 500 U.S. at 199 n. 5, 111 S.Ct. 1759; *see* Appellants' Opening Br. at 33–34. We reject appellants' argument for the same reasons *Rust* rejected the petitioners' argument.

First, a recipient is not compelled to accept a subsidy from the LSC. A recipient can decline the federal subsidy and avoid being subject to the restrictions. *See Rust,* 500 U.S. at 199 n. 5, 111 S.Ct. 1759; *Grove City College v. Bell,* 465 U.S. 555, 575, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (conditioning federal assistance on compliance with a federal program does not violate petitioner's First Amendment rights because the recipient "may terminate its participation in the [program] and thus avoid the requirements of [the program]"). By choosing to accept LSC funds, "a recipient voluntarily consents to any restrictions placed on any matching funds or grant-related income," *Rust,* 500 U.S. at 199 n. 5, 111 S.Ct. 1759. Second, the LSC regulations only govern recipients of LSC funds and any related entities that fail to satisfy the program integrity requirements. If the recipient wishes to engage in prohibited activities, it remains free to use private funds to finance these activities if it complies with the separation requirements of § 1610.8.

Third, the Supreme Court did not apply a compelling interest test in *Rust.* Appellants argue that the Court in *Rust* upheld the regulations because they were a "direct response" to the "observation[ ]" in a General Accounting Office report that the public "can get the impression" that federal funds are supporting abortion activities, 500 U.S. at 188, 111 S.Ct. 1759. *See* Appellants' Opening Br. at 29. This is incorrect. Appellants fail to explain the complete absence of any reference to a compelling interest test in *Rust* or any mention by the Court that the regulations were valid because there was a compel-

ling interest in correcting a public misimpression. Indeed, appellants admit that the Court did not refer to "strict scrutiny" in *Regan, League of Women Voters,* or *Rust.* Appellants' Opening Br. at 31 n. 21. At most, it appears that the Court applied heightened scrutiny in *League of Women Voters* because, unlike *Rust* and this case, the restrictions did not permit the formation of separate affiliates. In sum, appellants' threshold strict scrutiny test simply does not exist.

■ Finally, appellants claim that the restrictions violate the First Amendment rights of full-time legal services lawyers. In a footnote in their Opening Brief, they suggest that the regulations are unconstitutional because full-time legal services lawyers are barred from engaging in the outside practice of law. Thus, they argue, full-time lawyers may not pursue prohibited activities on their own time, unlike the doctors in *Rust,* who could pursue abortion-related activities when they were not working for the Title X project. 500 U.S. at 198, 111 S.Ct. 1759. Even if we were to assume that it is sufficient to raise an argument by placing it in a footnote on page forty-six of an opening brief, we would reject the argument.

It is true that longstanding LSC regulations generally prohibit the outside practice of law. *See* 45 C.F.R. pt. 1604 (1976). The purpose of this provision, which is common in government agencies, is to ensure that outside demands "do not hinder fulfillment of the attorney's overriding responsibility to serve those eligible for assistance under the Act." 45 C.F.R. § 1604.1. According to the LSC, the provision "is essential to insure that a legal services lawyer does not compete with lawyers in private practice, is not burdened by excessive court appointments," and does not accept other commitments that might interfere with rendering quality full-time ·legal assistance to eligible clients. 41 Fed. Reg. 18,511, 18,512 (1976). Like the restrictions on doctors in *Rust,* the restrictions on a LSC-funded attorney are a consequence of that attorney's decision to accept full-time employment with a LSC funded organization. If an attorney wishes to engage in prohibited activities, the attorney could work part-time at an unrestricted organization in certain cir-

cumstances or engage on his own time in restricted activities that do not involve the outside practice of law, such as lobbying. Appellants' unsupported assertion that the restriction on sharing of personnel precludes working part-time at an unrestricted organization is contradicted by the record. *See* Supplemental Excerpts of R. at 34–35 (allowing attorney to convert full-time employment with a LSC recipient to part-time employment and permitting his participation in prohibited activities outside of his work for the LSC recipient). Appellants' argument is without support and we reject it.

### B. Equal Protection and Due Process

■ Appellants argue that the restrictions violate the Fifth Amendment rights of legal services clients "to obtain fair and equal access to the courts." Appellants' Opening Br. at 49. They claim that the restrictions violate the Due Process Clause by interfering with the client's right to retain a lawyer of his or her choice and the client's right to engage in meaningful advocacy. They also raise an equal protection challenge because, according to appellants, the restrictions deny clients "equal access to the courts based on their indigence and the causes they wish to espouse." *Id.* at 53.

Appellees argue that appellants lack standing to assert the rights of clients of legal services organizations, and, in any event, the claims are meritless. The district court held that appellant CSCC had standing, but rejected appellants' claims on the merits.

■ Prior to the recent decision of the Supreme Court in *Steel Co. v. Citizens for a Better Environment,* —— U.S. ——, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), we may have found it easier to avoid the issue of standing by assuming jurisdiction and proceeding to the merits under the doctrine of "hypothetical jurisdiction." Under this doctrine, a court will assume jurisdiction and decide the merits if the merits are "more readily resolved" and "the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." *Id.* 118 S.Ct. at 1012; *see United States v. Troescher,* 99 F.3d 933, 934 n. 1 (9th Cir.1996); *Clow v. U.S. Dep't of Housing and Urban Dev.,* 948 F.2d

614, 616 n. 2 (9th Cir.1991). The Supreme Court rejected this doctrine "because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers." *Steel Co.*, 118 S.Ct. at 1012. Thus, we must "spend [our] time and energy puzzling over the correct answer to an intractable jurisdictional matter," *id.* 118 S.Ct. at 1021 (Breyer, J., concurring), even if we think that the substantive merits are easily disposed of by well-settled law.

■■■■ The "irreducible constitutional minimum of standing" contains three requirements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). First, there must be an "injury in fact." The "injury in fact" must be the invasion of a legally protected interest which is "concrete and particularized," *id.*, and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). Second, there must be causation-"a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." *Steel Co.*, 118 S.Ct. at 1016–17. Third, there must be redressability-"a likelihood that the requested relief will redress the alleged injury." *Id.* 118 S.Ct. at 1017.

Appellants asserted below that indigent clients of legal service organizations are parties to this action through the California State Client Council (CSCC). 981 F.Supp. at 1299. CSCC "is an unincorporated association whose members are indigent clients of legal services programs who also sit on the boards of those programs." Compl. ¶ 40. The purpose of CSCC is to "meet and discuss issues of concern to the community of impoverished legal services organization clients, to develop policies of assistance in alleviating their adverse conditions, to work with legal services programs to ensure that those programs meet the needs of their clients, and to encourage leadership activities" of low-income clients. *Id.* ¶ 41.

The district court found that CSCC had suffered an "injury in fact." The court relied on an affidavit submitted by the Chair of the CSCC stating that CSCC's "own organizational efforts have been adversely affected by LSC restrictions ... [because] [t]he new LSC restrictions have prevented some legal services programs ... from using non-LSC money to provide assistance" for CSCC's efforts to assist low-income clients. Declaration of Lucinda Horne ¶ 8 attached to Pls.' Mot. for Prelim. Inj.; *see* 981 F.Supp. at 1299. Thus, relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the court concluded that CSCC established an injury and "has standing to challenge the restrictions on behalf of the clients." 981 F.Supp. at 1299.

The district court erred. The district court conflated the question of whether CSCC has standing to press claims for injury *on its own behalf* with the question of whether CSCC has representative standing to assert claims *on behalf of its members*. CSCC may have standing on its own behalf to assert a claim that the LSC restrictions resulted in a concrete injury to the CSCC. But we need not decide that issue because CSCC does not argue that the restrictions violate the rights of the organization. Instead, CSCC seeks representative standing to press the claim that the restrictions violate the equal protection and due process rights of its members.

■■■ The district court erred in basing its conclusion on an affidavit claiming that CSCC *as an organization* suffered an adverse impact from the restrictions. This conclusion was contrary to the requirements for establishing representative standing. "An association has standing to sue or defend in such capacity ... only if its members would have standing in their own right." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 1068, 137 L.Ed.2d 170 (1997). As the United States points out, *see* Br. at 37, and appellants fail to respond to, *see* Reply Br. at 26, "there is nothing in the record to suggest that any individual member of the CSCC has standing." United States Br. at 37.

■■■■ Instead, appellants argue that "numerous declarations" allege that the re-

strictions have denied unnamed indigent persons the opportunity to pursue claims. Reply Br. at 26. However, the "injury in fact" test " 'requires that the party seeking review be himself among the injured.' " *Lujan,* 504 U.S. at 563, 112 S.Ct. 2130 (quoting *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). To survive a summary judgment motion, appellants "had to submit affidavits or other evidence showing, through specific facts, ... that *one or more of [their] members* would [be] 'directly' affected apart from their 'special interest' in th[e] subject," *Lujan,* 504 U.S. at 563, 112 S.Ct. 2130 (quoting *Sierra Club,* 405 U.S. at 735, 739, 92 S.Ct. 1361) (emphasis added). Appellants do not point us to any evidence in the record establishing that these unnamed clients of legal services organizations are members of the CSCC or exactly how these clients satisfy the standing requirements so that we may scrutinize the affidavits of these members. *See Lujan,* 504 U.S. at 563–64, 112 S.Ct. 2130 (discussing specific allegations contained in affidavits of members of environmental organization to determine if standing exists). Thus, CSCC fails to establish that it has standing to assert the rights of its members.

The district court's reliance on *Havens Realty* was misplaced. *Havens Realty* held that an organization had standing in its own right because the organization established that the racial steering practices of the petitioner caused a drain·on that organization's resources. *See* 455 U.S. at 379, 102 S.Ct. 1114. The organization did not seek to assert the rights of its members, *id.* at 378, 102 S.Ct. 1114, and thus *Havens Realty* provides no support for concluding that CSCC has representative standing because there is a possible injury to the organization.

 Appellants do not present any other theory of standing beyond their reli-

ance on the presence of CSCC in this suit. A generous reading of their brief discussion of standing in their Reply Brief may suggest by implication that they seek third party standing to assert the rights of their clients even though they do not cite any relevant authority for this proposition, make no express argument, and fail to establish how they meet the requirements for third party standing.[8] Because appellants do not raise the issue of third party standing on appeal and do not demonstrate that they satisfy the requirements for third party standing, *see Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), we decline to allow third party standing in this case. We note that the Supreme Court has "recognized the right of litigants to bring actions on behalf of third parties, provided three important criteria are satisfied." *Id.* The requirements to establish third party standing include "injury in fact," a close relation to the third party, and "some hindrance to the third party's ability to protect his or her own interests." *Id.* at 411, 111 S.Ct. 1364. Appellants make no showing that the clients are unable to assert their own interests.

## IV. CONCLUSION

We AFFIRM the district court's judgment that the LSC restrictions do not violate appellants' First Amendment rights. We VACATE the district court's judgment that the LSC restrictions do not violate the due process and equal protection rights of indigent persons and REMAND the case with instructions to dismiss the complaint insofar as it asserts the rights of indigent persons because appellants have no standing to raise these issues.

---

8. The record discloses that they mentioned below in the reply to their motion for summary judgment that third party standing might exist. The district court stated in a footnote that "attorneys have third-party standing to assert the constitutional rights of their clients." *Legal Aid Soc'y of Hawaii v. Legal Servs. Corp.,* 981 F.Supp. 1288, 1299 n. 16 (D.Haw.1997). On appeal, appellants do not mention this possible method of establishing standing and we note that the district court's

broad statement is true only in specific, limited circumstances. *See, e.g., Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) (listing requirements for third party standing); *Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (noting "fundamental restriction" that party assert own rights admits of limited exceptions and listing requirements for exceptions to apply).